(No. 38475.—

EMMA GALLER, Appellant, *vs.* ISADORE A. GALLER *et al.,*
Appellees.

*Opinion filed November 24, 1964.—Modified on denial of rehearing
January 21, 1965.*

Arvey, Hodes & Mantynband, of Chicago, (Barnet Hodes, Sidney R. Zatz, and Jack H. Oppenheim, of counsel,) for appellant.

Mayer, Friedlich, Spiess, Tierney, Brown & Platt, of Chicago, (Frank D. Mayer, Robert L. Stern, Edward R. Lev, and George Bobrinskoy, Jr., of counsel,) for appellees.[1]

Mr. Justice Underwood delivered the opinion of the court:

Plaintiff, Emma Galler, sued in equity for an accounting and for specific performance of an agreement made in July, 1955, between plaintiff and her husband, of one part, and defendants, Isadore A. Galler and his wife, Rose, of the other. Defendants appealed from a decree of the superior court of Cook County granting the relief prayed. The First District Appellate Court reversed the decree and denied specific performance, affirming in part the order for an accounting, and modifying the order awarding master's fees. (45 Ill. App. 2d 452.) That decision is appealed here on a certificate of importance.

There is no substantial dispute as to the facts in this case. From 1919 to 1924, Benjamin and Isadore Galler, brothers, were equal partners in the Galler Drug Company, a wholesale drug concern. In 1924 the business was incorporated under the Illinois Business Corporation Act, each owning one half of the outstanding 220 shares of stock. In 1945 each contracted to sell 6 shares to an em-

ployee, Rosenberg, at a price of $10,500 for each block of 6 shares, payable within 10 years. They guaranteed to repurchase the shares if Rosenberg's employment were terminated, and further agreed that if they sold their shares, Rosenberg would receive the same price per share as that paid for the brothers' shares. Rosenberg was still indebted for the 12 shares in July, 1955, and continued to make payments on account even after Benjamin Galler died in 1957 and after the institution of this action by Emma Galler in 1959. Rosenberg was not involved in this litigation either as a party or as a witness, and in July of 1961, prior to the time that the master in chancery hearings were concluded, defendants Isadore and Rose Galler purchased the 12 shares from Rosenberg. A supplemental complaint was filed by the plaintiff, Emma Galler, asserting an equitable right to have 6 of the 12 shares transferred to her and offering to pay the defendants one half of the amount that the defendants paid Rosenberg. The parties have stipulated that pending disposition of the instant case, these shares will not be voted or transferred. For approximately one year prior to the entry of the decree by the chancellor in July of 1962, there were no outstanding minority shareholder interests.

In March, 1954, Benjamin and Isadore, on the advice of their accountant, decided to enter into an agreement for the financial protection of their immediate families and to assure their families, after the death of either brother, equal control of the corporation. In June, 1954, while the agreement was in the process of preparation by an attorney-associate of the accountant, Benjamin suffered a heart attack. Although he resumed his business duties some months later, he was again stricken in February, 1955, and thereafter was unable to return to work. During his brother's illness, Isadore asked the accountant to have the shareholders' agreement put in final form in order to protect Benjamin's wife, and this was done by another attorney

employed in the accountant's office. On a Saturday night in July, 1955, the accountant brought the agreement to Benjamin's home, and 6 copies of it were executed there by the two brothers and their wives. The accountant then collected all signed copies of the agreement and informed the parties that he was taking them for safe keeping. Between the execution of the agreement in July, 1955, and Benjamin's death in December, 1957, the agreement was not modified. Benjamin suffered a stroke late in July, 1955, and on August 2, 1955, Isadore and the accountant and a notary public brought to Benjamin for signature two powers of attorney which were retained by the accountant after Benjamin executed them with Isadore as a witness. The plaintiff did not read the powers and she never had them. One of the powers authorized the transfer of Benjamin's bank account to Emma and the other power enabled Emma to vote Benjamin's 104 shares. Because of the state of Benjamin's health, nothing further was said to him by any of the parties concerning the agreement. It appears from the evidence that some months after the agreement was signed, the defendants Isadore and Rose Galler and their son, the defendant, Aaron Galler, sought to have the agreements destroyed. The evidence is undisputed that defendants had decided prior to Benjamin's death they would not honor the agreement, but never disclosed their intention to plaintiff or her husband.

On July 21, 1956, Benjamin executed an instrument creating a trust naming his wife as trustee. The trust covered, among other things, the 104 shares of Galler Drug Company stock and the stock certificates were endorsed by Benjamin and delivered to Emma. When Emma presented the certificates to defendants for transfer into her name as trustee, they sought to have Emma abandon the 1955 agreement or enter into some kind of a noninterference agreement as a price for the transfer of the shares. Finally, in September, 1956, after Emma had refused to

abandon the shareholders' agreement, she did agree to permit defendant Aaron to become president for one year and agreed that she would not interfere with the business during that year. The stock was then reissued in her name as trustee. During the year 1957 while Benjamin was still alive, Emma tried many times to arrange a meeting with Isadore to discuss business matters but he refused to see her.

Shortly after Benjamin's death, Emma went to the office and demanded the terms of the 1955 agreement be carried out. Isadore told her that anything she had to say could be said to Aaron, who then told her that his father would not abide by the agreement. He offered a modification of the agreement by proposing the salary continuation payment but without her becoming a director. When Emma refused to modify the agreement and sought enforcement of its terms, defendants refused and this suit followed.

During the last few years of Benjamin's life both brothers drew an annual salary of $42,000. Aaron, whose salary was $15,000 as manager of the warehouse prior to September, 1956, has since the time that Emma agreed to his acting as president drawn an annual salary of $20,-000. In 1957, 1958, and 1959 a $40,000 annual dividend was paid. Plaintiff has received her proportionate share of the dividend.

The July, 1955, agreement in question here, entered into between Benjamin, Emma, Isadore and Rose, recites that Benjamin and Isadore each own 47½% of the issued and outstanding shares of the Galler Drug Company, an Illinois corporation, and that Benjamin and Isadore desired to provide income for the support and maintenance of their immediate families. No reference is made to the shares then being purchased by Rosenberg. The essential features of the contested portions of the agreement are substantially as set forth in the opinion of the Appellate Court: (2) that the bylaws of the corporation will be amended to provide

for a board of four directors; that the necessary quorum shall be three directors; and that no directors' meeting shall be held without giving ten days notice to all directors. (3) The shareholders will cast their votes for the above named persons (Isadore, Rose, Benjamin and Emma) as directors at said special meeting and at any other meeting held for the purpose of electing directors. (4, 5) In the event of the death of either brother his wife shall have the right to nominate a director in place of the decedent. (6) Certain annual dividends will be declared by the corporation. The dividend shall be $50,000 payable out of the accumulated earned surplus in excess of $500,000. If 50% of the annual net profits after taxes exceeds the minimum $50,-000, then the directors shall have discretion to declare a dividend up to 50% of the annual net profits. If the net profits are less than $50,000, nevertheless the minimum $50,000 annual dividend shall be declared, providing the $500,000 surplus is maintained. Earned surplus is defined. (9) The certificates evidencing the said shares of Benjamin Galler and Isadore Galler shall bear a legend that the shares are subject to the terms of this agreement. (10) A salary continuation agreement shall be entered into by the corporation which shall authorize the corporation upon the death of Benjamin Galler or Isadore Galler, or both, to pay a sum equal to twice the salary of such officer, payable monthly over a five-year period. Said sum shall be paid to the widow during her widowhood, but should be paid to such widow's children if the widow remarries within the five-year period. (11, 12) The parties to this agreement further agree and hereby grant to the corporation the authority to purchase, in the event of the death of either Benjamin or Isadore, so much of the stock of Galler Drug Company held by the estate as is necessary to provide sufficient funds to pay the federal estate tax, the Illinois inheritance tax and other administrative expenses of the estate. If as a result of such purchase from the estate of the decedent the

amount of dividends to be received by the heirs is reduced, the parties shall nevertheless vote for directors so as to give the estate and heirs the same representation as before (2 directors out of 4, even though they own less stock), and also that the corporation pay an additional benefit payment equal to the diminution of the dividends. In the event either Benjamin or Isadore decides to sell his shares he is required to offer them first to the remaining shareholders and then to the corporation at book value, according each six months to accept the offer.

The Appellate Court found the 1955 agreement void because "the undue duration, stated purpose and substantial disregard of the provisions of the Corporation Act outweigh any considerations which might call for divisibility" and held that "the public policy of this state demands voiding this entire agreement".

While the conduct of defendants towards plaintiff was clearly inequitable, the basically controlling factor is the absence of an adverse effect upon a minority interest, together with the absence of public detriment. Since the issues here presented must be resolved in accordance with the public policy of this State as exemplified in prior decisions or pertinent statutes, it will be helpful to review the applicable case law.

*Faulds* v. *Yates,* 57 Ill. 416, decided by this court in 1870, established the general rule that the owners of the majority of the stock of a corporation have the right to select the agents for the management of the corporation. This court observed (57 Ill. 416, 421) : "It is strange that a man can not, for honest purposes, unite with others in the protection and security of his property and rights without liability to the charge of fraud and inequity".

In *Higgins* .v. *Lansingh,* 154 Ill. 301, 357, this court again recognized the right of majority owners of stock to combine to secure the board of directors in the management of the corporation. There, the court went further and de-

nied the corporation and some of its stockholders the right to question the validity of an issue of preferred stock not provided for in the corporate charter, where the stockholders authorized the issue, the corporation paid dividends on it and all treated it as valid for 22 years.

In *Kantzler* v. *Bensinger,* 214 Ill. 589, decided in 1905, the issue of statutory violation was raised, and this court again followed *Faulds* v. *Yates,* emphasizing and quoting the following (p. 598) :

"In *Faulds* v. *Yates,* 57 Ill. 416, it was objected that an agreement between certain persons owning a majority of the stock of a corporation that they would elect the directors and manage the business was against public policy. There were other stockholders, but they made no objection. The court upheld the agreement, and on page 420 said: 'There was no fraud in the agreement which has been so bitterly assailed in the argument. There was nothing unlawful in it. There was nothing which necessarily affected the rights and interests of the minority. Three persons owning a majority of the stock had the unquestioned right to combine, and thus secure the board of directors and the management of the property. Corporations are governed by the republican principle that the whole are bound by the acts of the majority, when the acts conform to the law of their creation. The co-operation, then, of these parties in the election of the officers of the company, and their agreement not to buy or sell stock except for their joint benefit, cannot properly be characterized as dishonest and violative of the rights of others and in contravention of public policy. * * * The agreement complained of was entered into by Faulds and his partners. The shareholders whom he is so solicitous to defend and protect have not complained. He cannot invoke their shield to fight imaginary wrongs. The transaction which he, through his counsel, denounces as fraudulent and nefarious was conceived and consummated by him as much as by his partners. Every motive which

could influence a man for good should have prompted him to silence. If this combination was fraudulent and intended for bad purposes, the stockholders who are in a minority and who may have suffered have ample redress. We prefer to listen to them before any decision as to their wrongs.' This case was cited and approved in *Higgins* v. *Lansingh,* 154 Ill. 301."

Again, in 1913, this court in *Venner* v. *Chicago City Railway Co.* 258 Ill. 523, 539, followed the *Faulds* case and said: "There is no statute of this State which prohibits a trust of the stock of a corporation for the purpose of controlling its management. There is no rule of public policy in this State which prohibits the combination of the owners of the majority of the stock of a corporation for the purpose of controlling the corporation. On the contrary, it has been expressly held that a contract by the owners of more than one-half of the shares of stock of a corporation to elect the directors of the corporation so as to secure the management of its property, to ballot among themselves for directors and officers if they could not agree, to cast their vote as a unit as the majority should decide so as to control the election, and not to buy or sell stock except for their joint benefit is not dishonest, violative of the rights of others or in contravention of public policy, (*Faulds* v. *Yates,* 57 Ill. 416.) This case has been sustained by later decisions of this court, (*Higgins* v. *Lansingh,* 154 Ill. 301; *Kantzler* v. *Bensinger,* 214 id. 589) has been approved by the decisions of the court of other States [citing cases,] has been cited by text writers announcing the law as therein stated. [citation,] and we regard the decision as sound in principle."

In *Thompson* v. *Thompson Carnation Co.* 279 Ill. 54, 58, we again approved a contract by which the owners of a majority of stock agreed to vote for certain persons for directors so as to secure to themselves the control and management of the corporation and held such an agreement not

to be illegal or void so long as no fraud is committed on the corporation or wrong done to the other stockholders. In this case, as in the others, this court found that no fraud was practiced or intended to be practiced by the contract in question, and insofar as its validity was assailed on those grounds it was sustained as a valid exercise of the right of contract.

In *Schumann-Heink* v. *Folsom,* 328 Ill. 321, 330, we said: "In considering whether any contract is against public policy it should be remembered that it is to the interests of the public that persons should not be unnecessarily restricted in their freedom to make their own contracts. Agreements are not held to be void, as being contrary to public policy, unless they be clearly contrary to what the constitution, the statutes or the decisions of the courts have declared to be the public policy or unless they be manifestly injurious to the public welfare. Courts must act with care in extending those rules which say that a given contract is void because against public policy, since if there be one thing more than any other which public policy requires, it is that men of full age and competent understanding shall have the utmost liberty of contract, and that their contracts, when entered into fairly and voluntarily, shall be held sacred and shall be enforced by the courts."

Later, we said in *Electrical Contractors' Ass'n* v. *Schulman Electric Co.* 391 Ill. 333, 339: "The power by which courts may declare a contract void as against public policy is far-reaching and it is to be exercised only when it clearly appears that it is contrary to a constitutional mandate, a statute, judicial decisions, or that it manifestly tends to injure the public in some way. * * * The question must be determined from the terms of the contract itself and, in considering the ends to which it leads, the courts are not privileged to ascribe illegal purposes where there is nothing in the contract from which such a conclusion may be reasonably drawn. In *Kellogg* v. *Larkin,* 3 Pin., Wis., 123,

56 Am. Dec. 164, it was said: 'Before a court should determine a contract which has been made in good faith stipulating for nothing that is *malum in se*, nothing that is made *malum prohibitum*, to be void as contravening the policy of the state, it should be satisfied that the advantage to accrue to the public for so holding is certain and substantial, not theoretical or problematical'."

The power to invalidate the agreements on the grounds of public policy is so far reaching and so easily abused that it should be called into action to set aside or annul the solemn engagement of parties dealing on equal terms only in cases where the corrupt or dangerous tendency clearly and unequivocally appears upon the face of the agreement itself or is the necessary inference from the matters which are expressed, and the only apparent exception to this general rule is to be found in those cases where the agreement, though fair and unobjectionable on its face, is a part of a corrupt scheme and is made to disguise the real nature of the transaction. 12 Am. Jur. 671.

Defendants have referred us to cases in other jurisdictions and the Appellate Courts of this State, particularly *Odman* v. *Oleson,* 319 Mass. 24, 64 N.E.2d 439, and *Teich* v. *Kaufman,* 174 Ill. App. 306. Neither is persuasive, for *Odman* exemplifies the public policy of Massachusetts whose courts, while not holding agreements such as we have here invalid *per se,* have not relaxed their requirements of strict statutory compliance when dealing with close corporations, at least where all the stockholders have not signed the agreement in question. Anno: Validity and Effect of Agreement Controlling the Vote of Corporate Stock, 45 A.L.R. 2d 799, 815. In any event, decisions setting forth the public policies of other jurisdictions will not be followed if not harmonious with the judicially declared public policy of Illinois. (*Union T. & S. B.* v. *Kinlock, L. B. T. Co.* 169 Ill. App. 309, 314; affirmed 258 Ill. 202; *Schnackenberg* v. *Towle,* 351 Ill. App. 497, reversed 4 Ill.2d 561; *Faulds* v. *Yates,* 57 Ill. 416, 421.) *Teich* held the majority agreement

void as benefitting the individual interests of the major shareholders at corporate expense and to the detriment of the minority who had no knowledge of the agreement.

At this juncture it should be emphasized that we deal here with a so-called close corporation. Various attempts at definition of the close corporation have been made. For a collection of those most frequently proffered, see O'Neal, Close Corporations, § 1.02 (1958). For our purposes, a close corporation is one in which the stock is held in a few hands, or in a few families, and wherein it is not at all, or only rarely, dealt in by buying or selling. (*Brooks* v. *Willcuts,* (8th cir. 1935) 78 F.2d 270, 273.) Moreover, it should be recognized that shareholder agreements similar to that in question here are often, as a practical consideration, quite necessary for the protection of those financially interested in the close corporation. While the shareholder of a public-issue corporation may readily sell his shares on the open market should management fail to use, in his opinion, sound business judgment, his counterpart of the close corporation often has a large total of his entire capital invested in the business and has no ready market for his shares should he desire to sell. He feels, understandably, that he is more than a mere investor and that his voice should be heard concerning all corporate activity. Without a shareholder agreement, specifically enforceable by the courts, insuring him a modicum of control, a large minority shareholder might find himself at the mercy of an oppressive or unknowledgeable majority. Moreover, as in the case at bar, the shareholders of a close corporation are often also the directors and officers thereof. With substantial shareholding interests abiding in each member of the board of directors, it is often quite impossible to secure, as in the large public-issue corporation, independent board judgment free from personal motivations concerning corporate policy. For these and other reasons too voluminous to enumerate here, often the only sound basis for protection

is afforded by a lengthy, detailed shareholder agreement securing the rights and obligations of all concerned. For a discussion of these and other considerations, see Note, "A Plea for Separate Statutory Treatment of the Close Corporation", 33 N.Y.U.L. Rev. 700 (1958).

As the preceding review of the applicable decisions of this court points out, there has been a definite, albeit inarticulate, trend toward eventual judicial treatment of the close corporation as *sui generis*. Several shareholder-director agreements that have technically "violated" the letter of the Business Corporation Act have nevertheless been upheld in the light of the existing practical circumstances, *i.e.*, no apparent public injury, no apparent injury to a minority interest, and no apparent prejudice to creditors. However, we have thus far not attempted to limit these decisions as applicable only to close corporations and have seemingly implied that general considerations regarding judicial supervision of all corporate behavior apply.

The practical result of this series of cases, while liberally giving legal efficacy to particular agreements in special circumstances notwithstanding literal "violations" of statutory corporate law, has been to inject much doubt and uncertainty into the thinking of the bench and corporate bar of Illinois concerning shareholder agreements. See *e.g.*, Cary, "How Illinois Corporations May Enjoy Partnership Advantages: Planning for the Closely Held Firm," 48 N.W.U.L. Rev. 427; Note, "The Validity of Stockholders' Voting Agreements in Illinois," 3 U. Chi. L. Rev. 640.

It is therefore necessary, we feel, to discuss the instant case with the problems peculiar to the close corporation particularly in mind.

It would admittedly facilitate judicial supervision of corporate behavior if a strict adherence to the provisions of the Business Corporation Act were required in all cases without regard to the practical exigencies peculiar to the close corporation. *West v. Camden*, 135 U.S. 507, 34 L. ed.

254. However, courts have long ago quite realistically, we feel, relaxed their attitudes concerning statutory compliance when dealing with close corporate behavior, permitting "slight deviations" from corporate "norms" in order to give legal efficacy to common business practice. See, *e.g.,* *Clark* v. *Dodge,* 269 N.Y. 410, 199 N.E. 641; *Benintendi* v. *Kenton Hotel,* 294 N.Y. 112, 60 N.E.2d 829 (dissenting opinion subsequently legislatively approved.) This attitude is illustrated by the following language in *Clark* v. *Dodge*: "Public policy, the intention of the Legislature, detriment to the corporation, are phrases which in this connection [the court was discussing a shareholder-director agreement whereby the directors pledged themselves to vote for certain people as officers of the corporation] mean little. Possible harm to bona fide purchasers of stock or to creditors or to stockholding minorities have more substance; but such harms are absent in many instances. If the enforcement of a particular contract damages nobody— not even, in any perceptible degree, the public—one sees no reason for holding it illegal, even though it impinges slightly on the broad provisions of [the relevant statute providing that the business of a corporation shall be managed by its board of directors.]. Damage suffered or threatened is a logical and practical test, and has come to be the one generally adopted by the courts. See 28 Columbia L. Rev. 366, 372." *Clark* v. *Dodge,* 199 N.E. 641, 642.

Again, "As the parties to the action are the complete owners of the corporation, there is no reason why the exercise of the power and discretion of the directors cannot be controlled by valid agreement between themselves, provided that the interests of creditors are not affected." *Clark* v. *Dodge,* 119 N.E. 641, 643, quoting from *Kassel* v. *Empire Tinware Co.* 178 App. Div. 176, 180, 164 N.Y.S. 1033, 1035.

Numerous helpful textual statements and law review articles dealing with the judicial treatment of the close

corporation have been pointed out by counsel. One article concludes with the following: "New needs compel fresh formulation of corporate 'norms'. There is no reason why mature men should not be able to adapt the statutory form to the structure they want, so long as they do not endanger other stockholders, creditors, or the public, or violate a clearly mandatory provision of the corporation laws. In a typical close corporation the stockholders' agreement is usually the result of careful deliberation among all initial investors. In the large public-issue corporation, on the other hand, the 'agreement' represented by the corporate charter is not consciously agreed to by the investors; they have no voice in its formulation, and very few ever read the certificate of incorporation. Preservation of the corporate norms may there be necessary for the protection of the public investors." Hornstein, "Stockholders'. Agreements in the Closely Held Corporation", 59 Yale L. Journal, 1040, 1056.

This court has recognized, albeit *sub silentio,* the significant conceptual differences between the close corporation and its public-issue counterpart in, among other cases, *Kantzler* v. *Bensinger,* 214 Ill. 589, where an agreement quite similar to the one under attack here was upheld. Where, as in *Kantzler* and here, no injury to a minority interest appears, no fraud or apparent injury to the public or creditors is present, and no clearly prohibitory statutory language is violated, we can see no valid reason for precluding the parties from reaching any arrangements concerning the management of the corporation which are agreeable to all.

Perhaps, as has been vociferously advanced, a separate comprehensive statutory scheme governing the close corporation would best serve here. See Note "A Plea for Separate Statutory Treatment of the Close Corporation", 33 N.Y.U. L. Rev. 700. Some states have enacted legisla-

tion dealing specifically with the close corporation. See Fla. Stats. § 608.0100 *et seq.*; N. C. Gen. Stats. § 55—73(b), (c); N.Y. Bus. Corp. Law § 620.

At any rate, however, the courts can no longer fail to expressly distinguish between the close and public-issue corporation when confronted with problems relating to either. What we do here is to illuminate this problem— before the bench, corporate bar, and the legislature, in the context of a particular fact situation. To do less would be to shirk our responsibility, to do more would, perhaps be to invade the province of the legislative branch.

We now, in the light of the foregoing, turn to specific provisions of the 1955 agreement.

The Appellate Court correctly found many of the contractual provisions free from serious objection, and we need not prolong this opinion with a discussion of them here. That court did, however, find difficulties in the stated purpose of the agreement as it relates to its duration, the election of certain persons to specific offices for a number of years, the requirement for the mandatory declaration of stated dividends (which the Appellate Court held invalid), and the salary continuation agreement.

Since the question as to the duration of the agreement is a principal source of controversy, we shall consider it first. The parties provided no specific termination date, and while the agreement concludes with a paragraph that its terms "shall be binding upon and shall inure to the benefits of" the legal representatives, heirs and assigns of the parties, this clause is, we believe, intended to be operative only as long as one of the parties is living. It further provides that it shall be so construed as to carry out its purposes, and we believe these must be determined from a consideration of the agreement as a whole. Thus viewed, a fair construction is that its purposes were accomplished at the death of the survivor of the parties. While these life spans

are not precisely ascertainable, and the Appellate Court noted Emma Galler's life expectancy at her husband's death was 26.9 years, we are aware of no statutory or public policy provision against stockholder's agreements which would invalidate this agreement on that ground. (*Thompson* v. *Thompson Carnation Co.* 279 Ill. 54.) *Vogel* v. *Melish,* No. 38518, decided this term, also involved a construction of a contract in a close corporation, but not the validity of the contract. While defendants argue that the public policy evinced by the legislative restrictions upon the duration of voting trust agreements (Ill. Rev. Stat. 1963, chap. 32, par. 157.30a) should be applied here, this agreement is not a voting trust, but as pointed out by the dissenting justice in the Appellate Court, is a straight contractual voting control agreement which does not divorce voting rights from stock ownership. That the policy against agreements in which stock ownership and voting rights are separated, indicated in *Luthy* v. *Ream,* 270 Ill. 170, is inapplicable to voting control agreements was emphasized in *Thompson* wherein a control agreement was upheld as not attempting to separate ownership and voting power. While limiting voting trusts in 1947 to a maximum duration of 10 years, the legislature has indicated no similar policy regarding straight voting agreements although these have been common since prior to 1870. In view of the history of decisions of this court generally upholding, in the absence of fraud or prejudice to minority interests or public policy, the right of stockholders to agree among themselves as to the manner in which their stock will be voted, we do not regard the period of time within which this agreement may remain effective as rendering the agreement unenforceable.

The clause that provides for the election of certain persons to specified offices for a period of years likewise does not require invalidation. In *Kantzler* v. *Bensinger,*

214 Ill. 589, this court upheld an agreement entered into by all the stockholders providing that certain parties would be elected to the offices of the corporation for a fixed period. In *Faulds* v. *Yates,* 57 Ill. 416, we upheld a similar agreement among the majority stockholders of a corporation, notwithstanding the existence of a minority which was not before the court complaining thereof. See also Hornstein, "Judicial Tolerance of the Incorporated Partnership," 18 Law and Contemporary Problems, 435 at page 444.

We turn next to a consideration of the effect of the stated purpose of the agreement upon its validity. The pertinent provision is: "The said Benjamin A. Galler and Isadore A. Galler desire to provide income for the support and maintenance of their immediate families." Obviously, there is no evil inherent in a contract entered into for the reason that the persons originating the terms desired to so arrange their property as to provide post-death support for those dependent upon them. Nor does the fact that the subject property is corporate stock alter the situation so long as there exists no detriment to minority stock interests, creditors or other public injury. It is, however, contended by defendants that the methods provided by the agreement for implementation of the stated purpose are, as a whole, violative of the Business Corporation Act (Ill. Rev. Stat. 1963, chap. 32, pars. 157.28, 157.30a, 157.33, 157.34, 157.41) to such an extent as to render it void *in toto.*

The terms of the dividend agreement require a minimum annual dividend of $50,000, but this duty is limited by the subsequent provision that it shall be operative only so long as an earned surplus of $500,000 is maintained. It may be noted that in 1958, the year prior to commencement of this litigation, the corporation's net earnings after taxes amounted to $202,759 while its earned surplus was $1,543,270, and this was increased in 1958 to $1,680,079 while earnings were $172,964. The minimum earned surplus re-

quirement is designed for the protection of the corporation and its creditors, and we take no exception to the contractual dividend requirements as thus restricted. *Kantzler* v. *Bensinger,* 214 Ill. 589.

The salary continuation agreement is a common feature, in one form or another, of corporate executive employment. It requires that the widow should receive a total benefit, payable monthly over a five-year period, aggregating twice the amount paid her deceased husband in one year. This requirement was likewise limited for the protection of the corporation by being contingent upon the payments being income tax-deductible by the corporation. The charge made in those cases which have considered the validity of payments to the widow of an officer and shareholder in a corporation is that a gift of its property by a noncharitable corporation is in violation of the rights of its shareholders and *ultra vires.* Since there are no shareholders here other than the parties to the contract, this objection is not here applicable, and its effect, as limited, upon the corporation is not so prejudicial as to require its invalidation.

Having concluded that the agreement, under the circumstances here present, is not vulnerable to the attack made on it, we must consider the accounting feature of this action. The trial court allowed the relief prayed, an action we deem proper except as to the master's fees which were modified by the Appellate Court. Since no question is here raised regarding them, we affirm the action of that court in this respect. The questions as to salary which the Appellate Court correctly held were improperly increased became ones of fact to be determined by the trial court.

We hold defendants must account for all monies received by them from the corporation since September 25, 1956, in excess of that theretofore authorized.

Accordingly, the judgment of the Appellate Court is

reversed, except insofar as it relates to fees, and is, as to them affirmed. The cause is remanded to the circuit court of Cook County with directions to proceed in accordance herewith.

*Affirmed in part and reversed in part, and remanded with directions.*