Maxwell **POHN** and **S. M. & R. Co., Inc.,**
an Illinois Corporation, Plaintiffs,

v.

**DIVERSIFIED INDUSTRIES, INC., a**
Delaware Corporation,
Defendant.

No. 74 C 3261.

United States District Court,
N. D. Illinois, E. D.

Sept. 25, 1975.

Ira S. Kolb, Robert Dunn Glick, Schwartz, Cooper, Kolb & Gaynor, Chicago, Ill., for plaintiffs.

Patrick W. O'Brien, Mayer, Brown & Platt, Chicago, Ill., for defendant.

## MEMORANDUM DECISION

MARSHALL, District Judge.

This is a diversity action in which plaintiffs, Maxwell Pohn and S. M. & R. Co., Inc., both Illinois citizens, seek a declaratory judgment that defendant, Diversified Industries, Inc., a Delaware-Missouri corporate citizen, has breached a tripartite management agreement entered into among the parties on June 17, 1974, providing for Pohn's management of S. M. & R. Diversified's interest in that agreement stems from the fact that it owns 99% of the outstanding shares of S. M. & R., and prior to the agreement, provided management and administrative services for S. M. & R. Pohn previously moved for partial summary or judgment on the pleadings insofar as his complaint seeks a declaration that Diversified has breached the management agreement. That motion was denied on March 10, 1975, for the reasons stated in a memorandum decision of that date. In that memorandum, the court invited a motion from defendant for a summary adjudication that it had not breached the management agreement. That motion has now been made and is ready for decision.

The management agreement was entered into simultaneously with a stock purchase agreement between Pohn and Diversified and a shareholders' agreement among Pohn, S. M. & R. and Diversified. Prior to the execution of the three agreements, Diversified had owned all of the issued and outstanding shares of capital stock of S. M. & R. Under

the stock purchase agreement, Pohn acquired from Diversified 20 shares of the stock of S. M. & R. which constituted 1% of all of those shares. Under the shareholders' agreement, S. M. & R. agreed to purchase and Diversified agreed to sell the remaining 99% of the shares of S. M. & R. at a time keyed in part to the termination of the management agreement here involved. The price to be paid to S. M. & R. for Diversified shares is to be determined by a formula keyed substantially to ½ of the net income of S. M. & R. for the period commencing on the date the shareholders' agreement was excuted and continuing through the date of the termination of the management agreement, reduced by the aggregate of any state or federal income taxes properly paid or accrued by the company on its net income for such period, and increased by 10% of the net income of the company during such period after deduction of such state or federal income taxes and all funds deposited with respect to such income in an escrow established pursuant to the terms of an escrow agreement also simultaneously executed. As a consequence, upon the termination of the management agreement and the agreed to purchase by and sale to S. M. & R. of Diversified's shares, Pohn would become the sole shareholder in S. M. & R.

At the time Pohn's motion for summary judgment was denied, the terms of the shareholders' agreement, although pleaded generally in his complaint, had not been submitted to the court. All of the agreements are now a part of the record and they should be interpreted and applied in pari materia.

Furthermore, at the time Pohn's motion for summary judgment was denied, the contesting parties assumed the general validity of the management agreement and contented themselves to argue its construction. But the management agreement was so broad as to cause us to state, "What Pohn's position comes down to is simply this: under the terms of the management agreement, the Directors of S. M. & R. selected by Diversified, must rubber stamp his [Pohn's] decisions. This is an extraordinary position for a corporate officer to take, even within the framework of a closely held-wholly owned subsidiary such as S. M. & R. is in its relationship to Diversified."

All of the agreements provide that their "validity, construction and enforceability . . . shall be governed in all respects by laws of the State of Illinois." Because the parties, in retrospect, seem to have contested only the issue of the construction of the management agreement, we observed, "Regrettably, the parties have not seen fit to favor the court with any respectable authority coming from Illinois (or elsewhere for that matter) with regard to the soundness of Pohn's position." In opposition to Diversified's motion for summary judgment, Pohn has now submitted the decision of the Illinois Supreme Court in Galler v. Galler, 32 Ill.2d 16, 203 N.E.2d 577 (1964), and the cases there cited and discussed. Indeed, that authority was submitted to the court on a motion to reconsider denial of Pohn's motion for summary judgment. That motion for reconsideration was denied because it appeared to the court that the theories and authorities there advanced were different from and in addition to the position taken in the initial motion for summary judgment removing them from the proper office of a motion for reconsideration or rehearing. But Galler and its precursors are clearly germane to defendant's motion and compel its denial.

In Galler, the Illinois Supreme Court sustained an agreement made by the shareholders of a closely held corporation which provided for the declaration and payment of minimum annual dividends (so long as earned surplus was not impaired), the continuation of the payment of the salary received by a shareholder-officer to his widow over a five-year period aggregating twice the

amount paid the deceased shareholder-officer in one year, and the election of specified persons or their nominee to the board of directors. In sustaining the agreement, the Illinois Court said at 203 N.E.2d 584–585:

It would admittedly facilitate judicial supervision of corporate behavior if a strict adherence to the provisions of the Business Corporation Act were required in all cases without regard to the practical exigencies peculiar to the close corporation. *West v. Camden*, 135 U.S. 507, 10 S.Ct. 838, 34 L.Ed. 254. However, courts have long ago quite realistically, we feel, relaxed their attitudes concerning statutory compliance when dealing with close corporate behavior, permitting "slight deviations" from corporate "norms" in order to give legal efficacy to common business practice. See e. g., *Clark v. Dodge*, 269 N.Y. 410, 199 N.E. 641; *Benintendi v. Kenton Hotel*, 294 N.Y. 112, 60 N.E.2d 829, 159 A.L.R. 280 (dissenting opinion subsequently legislatively approved.) This attitude is illustrated by the following language in *Clark v. Dodge*: "Public policy, the intention of the Legislature, detriment to the corporation, are phrases which in this connection [the court was discussing a shareholder-director agreement whereby the directors pledged themselves to vote for certain people as officers of the corporation] mean little. Possible harm to bona fide purchasers of stock or to creditors or to stockholding minorities have more substance; but such harms are absent in many instances. If the enforcement of a particular contract damages nobody—not even, in any perceptible degree, the public—one sees no reason for holding it illegal, even though it impinges slightly upon the broad provisions of [the relevant statute providing that the business of a corporation shall be managed by its board of directors.]. Damage suffered or threatened is a logical and practical test, and has come to be the one generally adopted

by the courts. See 28 Columbia Law Review 366, 372." *Clark v. Dodge*, 199 N.E. 641, 642.

Again, "As the parties to the action are the complete owners of the corporation, there is no reason why the exercise of the power and discretion of the directors cannot be controlled by valid agreement between themselves, provided that the interests of creditors are not affected." *Clark v. Dodge*, 199 N.E. 641, 643, quoting from *Kassel v. Empire Tinware Co.*, 178 App.Div. 176, 180, 164 N.Y.S. 1033, 1035.

\* \* \* \* \* \*

Where, as . . . here, no complaining minority interest appears, no fraud or apparent injury to the public or creditors is present, and no clearly prohibitory statutory language is violated, we can see no valid reason for precluding the parties from reaching any arrangements concerning the management of the corporation which are agreeable to all.

In all of the papers filed here, both in opposition to Pohn's motion for summary judgment and in support of its own motion, Diversified has not suggested that we should not be guided by the Illinois Supreme Court's decision in *Galler*, and we conclude that we should in light of the principles flowing from *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S. Ct. 817, 82 L.Ed. 1188 (1938), and the controlling law provision of all of the agreements entered into by the parties.

Proceeding now on the premise of validity, enforceability and a contract consistent with the public policy of Illinois, we conclude that Pohn can enforce the management agreement and that the only reasonable construction of it supports his position. Diversified argues that Pohn's authority was limited to the "day-to-day" operations of the business which would not include his adoption of the employees' profit sharing trust which he submitted to Diversified for its transmittal with instructions to approve to the directors of S. M. & R.

elected by Diversified. But the agreement recognizes that "Pohn is uniquely qualified in all phases of [S. M. & R.'s] business" and it vested in him "... full responsibility, power and authority, in his sole discretion, to hire, retain, train, supervise and discharge all personnel employed by [S. M. & R. and its subsidiaries] and to relocate any such personnel, including authority to fix their compensation (including bonus or other incentive pay) and to negotiate and enter into contracts with labor unions relating thereto." These provisions we now conclude embrace the adoption of an employees' profit sharing plan such as that submitted by Pohn in the absence of a showing of bad faith, impairment of credit or the unreasonable reduction in S. M. & R.'s net profits (which are the key to the shareholders' agreement). None of these was advanced as a reason for rejection by Diversified when Pohn proposed the profit sharing plan and none of them is alleged here.

We further conclude that a fair interpretation of the management agreement (it having been approved by the boards of directors of both S. M. & R. and Diversified) is that Diversified's directors on the S. M. & R. board would approve plans such as this submitted by Pohn absent one of the foregoing reasons, and that Diversified would instruct its directors accordingly. This the directors and Diversified have concededly refused to do.

Upon reflection, we conclude that we erroneously looked to the terms of the proposed profit sharing plan for resolution of this controversy. The plan contemplates the review and approval by S. M. & R.'s directors of annual contributions to be made to the plan. Thus, it affords protection against impairment of credit or unreasonable reduction of net profits. The initial contribution contemplated by the proposal was a mere $300. In these circumstances director review and approval does not, in light of the broad language of the management

agreement and its interlocking relationship with the stock purchase and shareholders' agreements, justify out of hand rejection of the proposal.

Defendant's motion for summary judgment is denied. Upon reconsideration, plaintiff's motion for partial summary judgment that defendant has breached the management agreement is granted. The cause is set for report on status on October 15, 1975 at 10:00 a. m.