MARVIN K. BLOUNT, SR., FLORENCE TAFT BLOUNT, NELSON BLOUNT CRISP, MARVIN K. BLOUNT, JR. AND WILLIAM G. BLOUNT v. E. H. TAFT, JR., HELEN F. TAFT, E. H. TAFT III, THOMAS F. TAFT, RUTH J. TAFT, THOMAS F. TAFT, Trustee for MELANIE ANN TAFT, THOMAS F. TAFT, Trustee for EDMUND HOOVER TAFT IV, and FORD McGOWAN

No. 66

(Filed 29 August 1978)

1. **Corporations § 4.1— shareholders' agreement—attempt to conduct business as partnership**

   In this action by minority stockholders to specifically enforce an alleged stockholders' agreement, the term "shareholders' agreement" refers to an arrangement whereby all the shareholders in a close corporation, the stock of which is not traded in markets maintained by securities dealers or brokers, seek to conduct their business as if they were partners operating under a partnership agreement. G.S. 55-73(b).

2. **Corporations § 4.1— shareholders' agreements authorized in N. C.**

   N. C. authorized shareholders' agreements in the Business Corporation Act of 1955, codified as G.S. 55-1, *et seq.*

3. **Corporations § 4.2— bylaws—shareholders' agreement**

   Article III, Section 7 of the bylaws of a close corporation adopted unanimously by the shareholders on 20 August 1971 was a shareholders' agreement within the meaning of G.S. 55-73(b), since the terms "bylaws" and "shareholders' agreement" are not mutually exclusive, and bylaws which are unanimously enacted by all the shareholders of a corporation are also shareholders' agreements.

4. **Corporations § 4.1— shareholders' agreement—construction and enforcement like contracts—intent of parties controlling**

   Since consensual arrangements among shareholders are agreements—the products of negotiation—they should be construed and enforced like any other contract so as to give effect to the intent of the parties as expressed in their agreements, unless they violate the express charter or statutory provision, contemplate an illegal object, involve fraud, oppression or wrong against other shareholders, or are made in consideration of a private benefit to the promisor.

5. **Corporations § 4.2— bylaws as shareholders' agreement—method of amendment**

   The entire bylaws, all of which were unanimously adopted as a whole by a close corporation, constituted an agreement among the shareholders of the corporation, and Article III, Section 4 of those bylaws authorized the repeal of the bylaws by a majority vote of the directors.

6. **Corporations § 4.2— shareholders' agreement as part of bylaws—method of amendment**

   If a shareholders' agreement is made a part of the charter or bylaws, it will be subject to amendment as provided therein or, in the absence of an internal provision governing amendments, as provided by the statutory norms; therefore, where Section 7, dealing with the creation of an executive commit-

tee and employment of persons by a close corporation, and Section 4 providing for amendment or repeal of the bylaws by a majority of the directors, were unanimously incorporated into the bylaws at the same time, and there being no internal provision in Section 7 or elsewhere in the bylaws prohibiting its amendment except by unanimous consent of the shareholders, the parties intended Section 7 to be subject to amendment by the directors or shareholders according to the procedures applicable to the other bylaws.

**7. Corporations § 4.2— shareholders' agreement—avoidance of majority rule—specificity required**

Ordinarily, the function of a shareholders' agreement is to avoid the consequences of majority rule or other statutory norms imposed by the corporate form, and, since the purpose of such an arrangement is to deviate from the structures which are generally regarded as the incidents of a corporation, it is not unreasonable to require that the degree of deviation intended be explicitly set out.

ON petition for discretionary review of the decision of the Court of Appeals (reported in 29 N.C. App. 626, 225 S.E. 2d 583 (1976)), which reversed the judgment entered by *James, J.,* sitting without a jury at the 16 June 1975 Session of PITT Superior Court, docketed and argued as Case No. 11 at the Spring Term 1977.

Action by minority stockholders to specifically enforce an alleged stockholders' agreement.

Plaintiffs and defendants are the owners of all of the outstanding 578.5 shares of the capital stock of Eastern Lumber and Supply Company (Eastern), a closely held North Carolina corporation having its principal office in Winterville, North Carolina. Plaintiffs are all members of the Blount family. Together they are the direct or beneficial owners of 41% of the outstanding shares of Eastern. The defendant, E. Hoover Taft, Jr., and the three members of his family named in the caption as defendants also own 41% of Eastern's capital stock, and defendant McGowan owns the remaining 18%. At the time this action was instituted McGowan held the post of Treasurer and as such was the "chief operating officer" of Eastern. The parties stipulated that shares of Eastern's capital stock are not traded in the markets maintained by securities dealers and brokers.

In brief summary, plaintiffs' evidence, summarized except when quoted, tended to show:

In 1969 plaintiffs became concerned about "the nepotism situation which existed in Eastern." At a regular meeting of the

board of directors held on 4 December 1969, plaintiff William G. Blount made a motion that in the future unanimous approval of the stockholders be required before any relative or a stockholder could be employed by Eastern, and that unanimous approval of his continued employment be required annually. Defendant's evidence tended to show that although several other relatives of stockholders were employed by Eastern part-time during 1969, this resolution was primarily directed at the son of E. H. Taft, Jr., E. Hoover Taft III, the only relative then working full time for the Company. E. H. Taft, Jr., opposed the Blount motion, and it was defeated when McGowan voted with the Tafts.

Thereafter, no shareholders' or directors' meetings were held until 20 August 1971. At that time, Eastern was negotiating a $250,000 business expansion loan and the directors deemed it necessary to revise and update the old bylaws, to have more frequent meetings, and to conduct the corporation's business on a more orderly and formal basis. Accordingly, E. H. Taft, Jr., and Mrs. Nelson Blount Crisp, both of whom are attorneys, drafted new bylaws to be presented to the shareholders and directors for their approval at a special joint meeting held on 20 August 1971. This meeting was called primarily to gain director and stockholder approval for the $250,000 loan. A transcript of that meeting, introduced in evidence by plaintiffs, shows that the proposed bylaws were read, article by article; that discussion frequently followed the reading of an article; and that thereafter various changes were made in the proposals.

Article III, Section 7 of the bylaws (hereinafter referred to as Section 7), which is the subject of this action, as originally drafted and presented to the stockholders, read:

"Executive Committee. The Board of Directors may, by the vote of a majority of the entire board, designate three or more directors to constitute and serve as an Exeuctive Committee, which committee to the extent provided in such .resolution, shall have and may exercise all of the authority of the Board of Directors in the management of the corporation."

Mrs. Crisp immediately proposed that the executive committee be composed of one member each from the Blount, Taft and McGowan families. E. H. Taft, Jr., expressed his approval of this proposal. Thereafter, during a prolonged discussion, the Blounts argued that the executive committee should not have the authori-

ty to bind the Corporation without express ratification of its acts by the board of directors.

Additional bylaws were read and discussed, including Article VIII, Section 4, which provided:

"Amendments. Except as otherwise provided, these bylaws may be amended or repealed and new bylaws may be adopted by the affirmative vote of a majority of the directors then holding office at any regular or special meeting of the Board of Directors." (Here it is noted that no provisions for amendments were "otherwise provided" in the bylaws adopted 20 August 1971.)

Finally, McGowan moved that the proposed bylaws be adopted as modified. Mrs. Crisp seconded the motion, but before a vote could be taken, the following exchange took place:

"M. K. BLOUNT, SR.: You haven't brought in some amendment—don't you know?

"NELSON CRISP: This was as to full-time employees, the approval of full-time employees.

"MARVIN BLOUNT, JR.: Why don't you put where you have 'executive committee represented by members of each family, and Ford,' that all employees be unanimously approved. Is there any objection?

"E. H. TAFT, JR.: I have no objection.

"NELSON CRISP: He just brought out something, and this was my feeling from the beginning, that probably we do not need that in the by-laws, but rather in the meeting and in the minutes of a meeting.

"MARVIN BLOUNT, JR.: Would it hurt to put it in the by-laws?

"JOHN CAMPBELL: No."

After further discussion and an addition suggested by Mr. McGowan, Section 7 was unanimously adopted in the following words:

"Executive Committee. The Board of Directors may, by the vote of a majority of the entire board, designate three or more directors to constitute and serve as an Executive Committee, which committee to the extent provided in such resolution, shall have and may exercise all of the authority of the Board of Direc-

tors in the management of the corporation. Such committee shall consist of one member from the family of M. K. Blount, Sr., one member from the family of E. H. Taft, Jr., and one member from the family of Ford McGowan. Minutes of all such meetings shall be kept and a copy mailed to each member of the Board of Directors and action of the committee shall be submitted to the Board of Directors at its next meeting for ratification.

"The Executive Committee shall have the exclusive authority to employ all persons who shall work for the corporation and that the employment of each individual shall be only after the unanimous consent of the committee and after interview."

Following this last amendment to Article III, Section 7, a motion that the bylaws be adopted as changed and read was seconded and unanimously approved by all the stockholders and directors.

At trial the testimony of plaintiffs' witnesses related mainly to their recollections of what took place at the 20 August 1971 meeting. All conceded that neither before or after the stockholders had achieved unanimity as to the terms of Section 7 did any stockholder refer to their final concurrence as "a stockholders' agreement"; that Section 7 was voted on as a part of the bylaws; and that no one had mentioned or suggested that Section 7 was not a bylaw or that it was not subject to amendment. However, Mr. Marvin K. Blount, Jr., testified that it was his "understanding" at the time that this section could not be amended except by the unanimous consent of the stockholders.

At a stockholders' meeting held on 13 September 1971 the minutes of the 20 August 1971 meeting were read and approved and upon "motion made, seconded, and unanimously carried," the bylaws were again approved. Thereafter the minutes of subsequent stockholders' and directors' meetings reveal continuous controversy between the Blounts and the Taft-McGowan group over McGowan's management of the company and the authority of the executive committee. In all controversial matters before the board of directors the Blounts were outvoted by the Tafts and McGowans.

Following a fire which destroyed the company's warehouse on 16 November 1973, a special meeting of the board of directors was called on 1 December 1973 to consider the future of the company. One of the options discussed was the liquidation of the cor-

poration. The Blounts continued their criticism of McGowan, who requested "to know what his position was with the company at this time." The meeting was adjourned without any action having been taken on either question. At the next meeting, held 5 December 1973, the directors resolved that the corporation should actively seek to rebuild its business, and McGowan "declared that the Board could count on anything he did to be in the best interest of the corporation" and that any mistakes would be unintentional.

At a meeting held on 6 February 1974 to hear proposals for securing bids and financing the new building, M. K. Blount, Jr., renewed a former criticism of the size of the accounts receivable. A dispute also developed as to whether the firm should hire a certified public accountant to take inventory after the fire, as the Blounts desired, or whether the less expensive services of a public adjuster would suffice. By the usual vote of five to four the board voted to hire the public adjuster.

Special meetings of the directors were held on 2 April and 9 May 1974 to consider matters relating to the fire and to decide from what lending institution Eastern should borrow the money to rebuild and reestablish the business. At the meeting on May 9th the directors considered the corporation's financial report, business statement, and other matters. As to each motion made at that meeting the minute entry shows, "There were five voting for the motion, none against, and four abstentions, those being M. K. Blount, Jr., Nelson B. Crisp, W. G. Blount and Florence T. Blount. The motion carried."

The minutes of the directors' meeting held on 9 May 1974 also show: "The President appointed a committee to study the by-laws and make a report at a later meeting. The committee was composed of M. K. Blount, Jr., Thomas F. Taft, and Ford McGowan."

On 20 June 1974, at a meeting of the board of directors called to consider the proposed new bylaws, Mr. M. K. Blount, Sr., the founder of the corporation and a nonvoting director, was hospitalized in Durham. His wife, Florence Blount, a voting director, was at the hospital with her husband. M. K. Blount, Jr., requested that the meeting be delayed until his father and mother could be present. This request was denied and the meeting was convened. Mr. Blount, Jr., again inquired whether Mr. Manning, who was present, "had been and was at this time advising Mr. Taft and

Mr. McGowan each individually as to matters concerning division of corporate interests belonging to the Taft-Blount-McGowan families." He was told that he was not entitled to an answer to that question. Thereafter the Blounts took part in the general discussion of corporate matters which followed, but they again abstained from voting on all matters concerning the company's business.

When the proposed new bylaws were distributed, the minutes show that M. K. Blount, Jr., protested they were an effort by the majority stockholders, particularly the Taft family, "to change the bylaws to the best interests of that family, particularly the Executive Committee provision." Also according to the minutes, Mr. Thomas Taft countered this charge with the assertion that the reason for the change in the Executive Committee was the Blount Family's lack of cooperation in the conduct of the affairs of the corporation "as is evidenced by their abstention on all questions brought before the Executive Committee as well as the full Board of Directors." Mr. Blount, Jr., also objected to changing the August 1971 bylaws, which had been agreed to by all the stockholders, at a directors' meeting.

Following extended discussion, the bylaws were adopted by a vote of six to three, the three votes contra being cast by M. K. Blount, Jr., Nelson B. Crisp, and W. B. Blount, Jr. The president then declared that henceforth the company would operate under the new bylaws. Whereupon, speaking in behalf of the Blount family, M. K. Blount, Jr., stated their contention that the old bylaws remained in force and that they would question and contest any actions taken under the authority of the new bylaws.

The bylaws adopted at the 20 June 1974 meeting are not in the record. However, from the statement of facts contained in the briefs of both plaintiffs and defendants we learn that "the amended bylaws did not contain the provisions of Art. III, Sec. 7 as adopted on August 20, 1971." Deleted were "the provisions of an Exeuctive Committee composed of a representative of each of the three families, and the provision for approval of full-time employees by the Exeuctive Committee." In lieu of the deleted provisions, "the defendants adopted over the objections of the plaintiffs who were present, a new Article III, Section 9, . . ." providing as follows:

"9. Executive Committee: The Board of Directors may, by resolution adopted by a majority of the number of directors fixed

by resolution under these bylaws, designate two or more directors to constitute an Executive Committee, which Committee, to the extent provided in such resolution, shall have and may exercise all of the authority of the Board of Directors in the management of the corporation."

Pursuant to the foregoing section, the Board of Directors adopted a resolution—"five for the motion and three abstentions"—appointing "an Executive Committee consisting of three members, E. H. Taft, Jr., Ford McGowan, and W. G. Blount."

Defendants' evidence consisted of the testimony of Ford McGowan, E. H. Taft, Jr., E. H. Taft III, and another. In essence their testimony tended to show that there had never been any discussion between them or anyone else as to whether Article III, Section 7 of the bylaws adopted on 20 August 1971 was an irrevocable shareholders' agreement.

At the close of all the evidence the judge announced that he would hold Section 7 to be a valid stockholders' agreement which could be amended only by a majority vote of the directors. Thereafter, he entered judgment in which he found facts consistent with the evidence summarized herein and adjudged, *inter alia*, (1) that Section 7 constituted "a valid and binding stockholders' agreement within the intent and meaning of N.C. Gen. Stats. § 55-73(b); (2) that the terms of Section 7 were clear and unambiguous and, "having been unanimously assented to, it was not and is not subject to amendment or repeal in any manner for a period not to exceed ten (10) years from August 20, 1971, except upon and by the unanimous assent of all the shareholders of Eastern Lumber and Supply Company"; (3) that Section 7 was not repealed or amended by the bylaws enacted by the board of directors on 20 June 1974; and (4) that with the exception of Section 7 the bylaws adopted August 20, 1971 were subject to amendment and were in fact, amended on June 20, 1974. (Enumeration ours.)

The court then ordered that plaintiffs have specific enforcement of Article III, Section 7. Defendants appealed and the Court of Appeals reversed, holding that there was no evidence in the record to support the conclusion of the trial court that Section 7 was a shareholders' agreement "which could not be amended as provided by Article VIII, Section 4, of the said bylaws or the conclusion that said Section 7 was not validly amended, as were

other bylaws, at the meeting of the board of directors on 20 June 1974." Plaintiffs' petition for discretionary review was allowed.

*Haywood, Denny & Miller by Egbert L. Haywood and John C. Martin for plaintiff-appellants.*

*Manning, Fulton & Skinner by Howard E. Manning and Dan J. McLamb for defendant-appellee.*

SHARP, Chief Justice.

This appeal presents a two-part question: Was Section 7 of Eastern's bylaws, adopted 20 August 1971, a valid shareholders' agreement; and, if so, was it subject to amendment under Section 4, which authorized amendment, repeal, or re-write of the bylaws by the affirmative vote of a majority of the stockholders?

The trial judge found as a fact that on 20 August 1971 all the shareholders of Eastern, by unanimous vote, adopted a set of bylaws. Among these was Section 7, which authorized the board of directors, by a majority vote, to designate an executive committee composed of three of its members — one from each of the three families who owned the stock of Eastern. This committee was given exclusive authority to select the company's employees but the unanimous consent of its members was required for the employment of any individual. This finding is supported by plenary competent evidence in the record and therefore may not be disturbed on appeal. *Cogdill v. North Carolina State Highway Commission,* 279 N.C. 313, 182 S.E. 2d 373 (1971); 1 Strong's N. C. Index 3d, *Appeal and Error* § 57.2 (1976).

Defendants do not seriously question any of the trial judge's findings of fact. They do, however, dispute his conclusions of law (1) that Section 7, albeit incorporated in the bylaws of 20 August 1971 by unanimous consent of the stockholders, was a shareholders' agreement within the intent and meaning of G.S. 55-73(b); and (2) that Section 7 is binding upon the shareholders for a period not to exceed ten years from 20 August 1971 unless repealed or amended by the unanimous consent of all Eastern's shareholders. These conclusions of law are subject to appellate review, *Harrelson v. Insurance Co.,* 272 N.C. 603, 158 S.E. 2d 812 (1968), and we consider them seriatim.

[1] We shall here attempt no precise definition of a "shareholders' agreement." In a broad sense the term refers to

any agreement among two or more shareholders regarding their conduct in relation to the corporation whose shares they own. *See* N. C. Gen. Stats. § 55-73 (1975). The form and substance of such an agreement will vary with the nature of the business and the objectives of the parties. It may be an agreement between stockholders in a corporation the shares of which are publicly traded or one whose shares are closely held. However, "[a]greements among shareholders are primarily a feature of close corporations." 6 Cavitch, Business Organizations § 114.01 (1978). In the context of this case the term refers to an arrangement whereby all the shareholders in a close corporation, the stock of which is not traded in markets maintained by securities dealers or brokers, seek to conduct their business as if they were partners operating under a partnership agreement. G.S. 55-73(b).

By means of a shareholders' agreement a small group of investors who seek gain from direct participation in their business and not from trading its stock or securities in the open market can adopt the decision-making procedures of partnership, avoid the consequences of majority rule (the standard operating procedure for corporations), and still enjoy the tax advantages and limited liability of a corporation. Such businesses are, with reason, often called "incorporated parnerships." Cary, *How Close Corporations May Enjoy Partnership Advantages:* Planning for the Closely Held Firm. *See* 48 N.W. U.L. Rev. 427 (1953); 6 Cavitch, Business Corporations § 114.01 (1978).

In earlier years, when statutes and principles governing the law of corporations were principally concerned with corporations having publicly traded stocks, agreements among shareholders — whether taking the form of voting trusts, pooling agreements, or extrinsic contracts — confronted considerable judicial antipathy. Courts would invalidate such consensual arrangements on the grounds that they severed from the stock incidents of ownership, such as the rights of voting and alienation, or prevented stockholders from voting "in the best interests of the corporation," or were inconsistent with the principle of majority rule embedded in the statutory norms. 1 O'Neal, Close Corporations, §§ 5.04, 5.06 (2nd Ed. 1971). In connection with close corporations, agreements were also stricken if they violated the judicial doctrine, succinctly enunciated in *Jackson v. Hooper*, 76 N.J. Eq. 592, 599, 75 A. 568, 571, 27 L.R.A. (NS) 658, 663 (Ct. Err. & App. 1910), that shareholders "cannot be partners inter sese

and a corporation as to the rest of the world." *See Beintendi v. Keaton Hotel,* 294 N.Y. 112, 60 N.E. 2d 829 (1945).

Over the years, however, both courts and legislatures gradually changed their thinking about the relationship which incorporation created between the state and businessman and their attitutde toward shareholders' agreements. 1 O'Neal, *supra,* § 3.52. For example, subject to certain specified limitations, voting trusts were expressly authorized by statutes, and shareholders were also given wider authority to agree upon arrangements deviating from certain corporate norms. *See e.g.,* G.S. 55-§§ 16, 24, 28, 31, 56, 65, 66, and 72 (1975). As the number of closely held corporations increased, experience revealed that the problems of a corporation whose stock is not generally publicly traded are different from those of a publicly held corpration. The authorization of the shareholders' agreements was a recognition of the needs of stockholders in a close corporation to be able to protect themselves from each other and from hostile invaders. 6 Cavitch, *supra,* § 114.01; 1 O'Neal, *supra* at § 1.11.

In such a business, if the internal "government" of the corporation was conducted strictly by the vote of the majority of the outstanding shares, the largest shareholder(s) could dominate the policies of the corporation over the objections of other shareholders. "In a nutshell, Family A with 51% ownership of a close corporation can live in luxury off a profitable business while Family B starves with 49%." Undoubtedly, "Family B" would not have invested their money in a rarely traded stock if they had thought that they would be excluded from the decision making process and thereby the benefits of the business. *See,* Latty, *Close Corporations and the New North Carolina Business Corporation Act,* 34 N.C.L. Rev. 432, 435 (1956) (hereinafter cited as Latty); O'Neal, "Squeeze-Outs" of Minority Shareholders, § 2.10 (1975).

To protect their investment minority shareholders frequently resort to agreements (usually, and wisely, made at the time of incorporation) between themselves and the other shareholders which guarantee to the minority such things as restrictions on the transfer of stock; a veto power over hiring and decisions concerning salaries, corporate policies or distribution of earnings; or procedures for resolving disputes or making fundamental changes in the corporate charter. *See* 6 Cavitch, *supra,* §§ 114.02, 114.03[3]; Robinson, North Carolina Corporation Law and Practice § 7-7

(2d Ed. 1974). *See generally* 1 O'Neal, Close Corporations § 4.10 (2d Ed. 1971). The agreements may also require certain affirmative actions, such as the payment of dividends. *Geller v. Geller*, 32 Ill. 2d 16, 203 N.E. 2d 577 (1964); *Arizona Ins. Co. v. L. L. Constantin & Co.*, 247 F. 2d 388 (3rd Cir.), *cert. denied*, 355 U.S. 905 (1957). *See generally*, O'Neal, "Squeeze-Outs" of Minority Shareholders §§ 8.05-12 (1975). It has been said that "a well-drawn stockholders' agreement entered into contemporaneously with the formation of a corporation is the most effective means of protecting the minority shareholder." Elson, *Shareholders Agreements, a Shield for Minority Shareholders of Close Corporations*, 22 Bus. Lawyer 449, 457 (1967).

[2] North Carolina authorized shareholders' agreements in the Business Corporation Act of 1955, codified as G.S. 55-1, *et seq.* (1975). Professor O'Neal described this Act as "the first really extensive and imaginative statutory innovations on close corporations." 1 O'Neal, Close Corporations, § 1.14a, Ch. 1-p. 57 (1971). *See also* Bradley, *Toward a More Perfect Close Corporation—The Need for More and Improved Legislation*, 54 Geo. L.J. 1145, 1146 (1966).

With respect to close corporations, the heart of the North Carolina Act is G.S. 55-73. *See* Latty, *supra* 438-440. This statute labeled "Shareholders' Agreements," is divided into three sections. G.S. 55-73(a) validates and makes enforceable against its signatories for a limited period, a written "agreement between two or more shareholders" regarding the voting of their stock. *Stein v. Capital Outdoor Adv. Inc.*, 273 N.C. 77, 159 S.E. 2d 351 (1968). Section (c) of the statute provides that "an agreement between all or less than all of the shareholders" will not be invalidated as between the parties to it on the ground that it interferes with the discretion of the board of directors, but imposes upon the shareholder-parties liability for managerial acts similar to that which is imposed on directors. However, it is Section (b) of G.S. 55-73 which shareholders in a close corporation, whose stock is not generally traded in the markets maintained by securities dealers or brokers, regard as the most significant.

G.S. 55-73(b) provides, *inter alia*, that "no written agreement to which all of the shareholders have actually assented . . . which relates to any phase of the affairs of the corporation, . . . shall be invalid . . . on the ground that it is an attempt by the parties thereto to treat the corporation as if it were a partnership or to

arrange their relationships in a manner that would be appropriate only between partners." Such an agreement may be "embodied in the charter or bylaws or in any side agreement in writing and signed by all the parties thereto." This langauge has been widely borrowed for the close corporations statutes of several other jurisdictions. CAL. CORPORATIONS CODE ANN. § 300(b) (West 1977); DEL CODE ANN. tit. 8, § 354 (1975); FLA ST. ANN. § 607.107 (West 1977); KAN. STAT. § 17-7214 (1974); MD. CORP & ASS'NS CODE § 104 (1973); PA. STAT. ANN. tit. 15 § 1385 (Purdon Supp. 1978-79); S. C. CODE ANN. § 33-11-220 (1977). However, no decision from any of these jurisdictions involving the questions we consider here has been called to our attention.

[3]   Counsel have debated at length the question whether Section 7 of Eastern's bylaws is a bylaw or a shareholders' agreement within the meaning of G.S. 55-73(b). In our view this debate is sterile, for these terms are not mutually exclusive. Bylaws which are unanimously enacted by all the shareholders of a corporation are also shareholders' agreements. Consensual agreements coming with G.S. 55-73(b) are shareholders' agreements whether they are embodied in the bylaws or in a duly executed side agreement. No particular title, phrasing or content is necessary for a consensual arrangement among all shareholders to constitute a "shareholders' agreement." Consequently, we hold that Section 7 of the bylaws adopted on 20 August 1971 is a shareholders' agreement within the meaning of G.S. 55-73(b). The decision of the Court of Appeals to the contrary is disapproved.

[4]   However, contrary to the arguments of counsel, this holding does not determine this case. Since consensual arrangements among shareholders are *agreements*—the products of negotiation—they should be construed and enforced like any other contract so as to give effect to the intent of the parties as expressed in their agreements, unless they "violate the express charter or statutory provision, contemplate an illegal object, involve . . . fraud, oppression or wrong against other shareholders, or are made in consideration of a private benefit to the promisor. . . ." *Wilson v. McClenny*, 262 N.C. 121, 129, 136 S.E. 2d 569, 575 (1964). *Accord, Stein v. Capital Outdoor Adv., Inc., supra.*

[5]   The trial judge ruled that Section 7, as a shareholders' agreement, was incapable of amendment or repeal for ten years except by unanimous assent of all the stockholders. Section 7, however, was only *one* of a complete set of bylaws, all of which—after a

section-by-section consideration which involved several revisions of Section 7 — were unanimously adopted as a whole by a vote of all of Eastern's shareholders. Thus, the entire bylaws constituted an agreement among the shareholders. Article VIII, Section 4 of those bylaws (hereinafter "Section 4") authorized the repeal of "these bylaws" by a majority vote of the directors, except as otherwise provided therein. As we noted in the preliminary statement of facts, neither in Section 7 nor elsewhere in the bylaws was there any other provision regarding amendment or repeal of "these bylaws." Nothing else appearing, therefore, the presumption is that the parties intended Section 4 to apply to every section of the bylaws.

Plaintiffs argue, however, that because Section 7 is the only bylaw which "arranges [the shareholders'] relationships in a manner that would be appropriate only between partners," it alone should be treated as a shareholders' agreement and thus be the only bylaw not subject to amendment or repeal under Section 4. This contention misunderstands the significance of G.S. 55-73(b).

That section creates no distinctions between a shareholders' agreement in which the parties seek to deal with the corporation as a partnership and any other stockholders' agreement "which relates to any phase of the affairs of the corporation." It adds nothing, either expressly or impliedly, to the words of the agreement; nor does it suspend the rules of contract law relating to its construction, modification or rescission. G.S. 55-73(b) merely provides that a shareholders' agreement in which the parties seek to deal with affairs of the corporation in a manner "which would be appropriate only between partners" *is not invalid for that reason.* Section (b), like the other two sections of G.S. 58-73, simply abrogates, as to agreements within its purview, certain judicial doctrines which had formerly invalidated particular shareholders' agreements on those grounds which the statute now disallows. A shareholders' agreement is not valid and enforceable merely because it fits the specifications of G.S. 55-73. It can be invalidated under the law of contracts upon any ground which would entitle a party to such relief. *See Stein v. Capital Outdoor Ad., Inc., supra* at 84, 159 S.E. 2d at 356.

The reason for phrasing the provisions of G.S. 55-73 mainly in the negative was to provide latitude to both the shareholders who enter into agreements "which relate to . . . the affairs of the corporation" and to the courts which must construe and assess their

contracts. As pointed out by Professor Latty, the underlying purpose of the statute was to furnish shareholders "a legal framework within which partnership-like arrangements having a reasonable business purpose could be worked out with a substantial assurance of legal validity." Latty, *supra* at 439. The statute was not intended to, and it does not, define "shareholders' agreements" to mean only those arrangements which "are an attempt . . . to treat the corporation as if it were a partnership" or which "arrange . . . relationships in a manner that would be appropriate only between partners."

[6] G.S. 55-73(b) permits shareholders to embody their agreement "in the charter or the bylaws or in any side agreement in writing signed by all the parties thereto." Had Section 7 been a "side agreement" signed by all the stockholders, and not been made a part of the bylaws, it is plausible to argue that absent an internal provision governing its amendment it could be amended only by unanimous consent of all the stockholders. As the Court of Appeals noted in its opinion, "a shareholders' agreement may not be altered or terminated except as provided by the agreement, or by all parties, or by operation of law." *Blount v. Taft*, 29 N.C. App. 626, 630, 225 S.E. 2d 583, 586. Had Section 4 been omitted from the bylaws, the directors would have been precluded from amending Section 7 since it is a bylaw adopted by the shareholders. G.S. 55-16(a)(1). In the absence of a valid provision in the charter or bylaws controlling amendment, statutory or common law norms governing amendment apply. *See Webb v. Morehead*, 251 N.C. 394, 111 S.E. 2d 586 (1959). Similarly, when parties to a shareholders' agreement choose to embody it in the charter or bylaws, it must be concluded that they intended for these norms to apply absent an expressed intention to deviate from them.

"All contemporaneously executed written instruments between the parties, relating to the subject matter of the contract, are to be construed together in determining what was undertaken." *Yates v. Brown*, 275 N.C. 634, 640, 170 S.E. 2d 477, 482 (1969). Here Section 7 and Section 4 were unanimously incorporated into the bylaws at the same time. There being no internal provision in Section 7 or elsewhere in the bylaws prohibiting its amendment except by unanimous consent of the shareholders, we conclude that the parties intended Section 7 to be subject to amendment by the directors or shareholders according to the procedures applicable to the other bylaws. In any event, that is the

agreement they made. We hold, therefore, that if a shareholders' agreement is made a part of the charter or bylaws it will be subject to amendment as provided therein or, in the absence of an internal provision governing amendments, as provided by the statutory norms.

[7] Ordinarily the function of a shareholders' agreement is to avoid the consequences of majority rule or other statutory norms imposed by the corporate form. Since the purpose of these arrangements is to deviate from the structures which are generally regarded as the incidents of a corporation, it is not unreasonable to require that the degree of deviation intended be explicitly set out. Most commentators advise the draftsman of a shareholders' agreement to include a specific provision governing amendments. *See* McNulty, *Corporations and the Intertemporal Conflicts of Law,* 55 Cal. L. Rev. 12, 27 *et seq.* (1967); O'Neal, *Giving Shareholders Power to Veto Corporate Decisions; Use of Special Charter and Bylaw Provisions,* 18 Law and Cont. Prob. 451, 469 (1953); O'Neal, "Squeeze-Outs" of Minority Shareholders, § 8.12 (1975). Requiring the insertion of such an amendment provision works no undue hardship on the parties if all are agreed upon its inclusion. McNulty, 55 Cal. L. Rev., *supra.*

Having concluded that the shareholders made Section 7 subject to the amendment power conferred upon the directors by Section 4, it will be enforced unless enforcement would contravene some principle of equity or public policy. Plaintiffs have not alleged that the acts of defendant constituted oppression or a breach of a fiduciary duty imposed by G.S. 55-32, G.S. 55-73(c), or the common law. *See Goines v. Long Mfg. Co.,* 234 N.C. 340, 67 S.E. 2d 350 (1951); Note 35 N.C.L. Rev. 271 (1957); O'Neal "Squeeze Outs" of Minority Shareholders, §§ 902-905 (1975). Further the record before us discloses no violation of public policy. Plaintiffs can obtain no benefit under the provisions of G.S. 55-16(a)(2) now in effect, as Section 7 was both enacted and amended prior to the effective date of the 1973 amendment of that subsection (1 October 1973). 1973 N.C. Sess. Laws, c. 469, s. 4 and s. 47. Nor is Section 7 a provision to which an amendment would be declared unreasonable and invalid as a matter of law despite an express grant of power to amend. *See, e.g., Duffy v. Insurance Co.,* 142 N.C. 103, 55 S.E. 79 (1906); *Lambert v. Fisherman's Dock Cooperative, Inc.,* 61 N.J. 596, 297 A. 2d 566 (1972). *See generally,* 8 Fletcher, Cyclopedia of Corporations §§ 4177, 4184-192 (Rev. 1966).

This decision, of course, will expose plaintiffs as minority shareholders in a close corporation to a risk from which Section 7 for a while protected them. However, minority shareholders who would have protection greater than that afforded by Chapter 55 of the General Statutes and the judicial doctrines prohibiting breach of a fiduciary relationship must secure it themselves in the form of "a well drawn" shareholders' agreement.

For the reasons stated in this opinion the action of the Court of Appeals in reversing the judgment of the trial court is

Affirmed.