CLYDE M. PENLEY v. BETTY ROBERTS PENLEY AND HAMBURG VALLEY, INC.

No. 8228SC1195

(Filed 3 January 1984)

1. Corporations § 16— stock subscription—necessity for writing

An oral agreement between plaintiff and defendant prior to the filing of the articles of incorporation that plaintiff would be entitled to 48% of the corporation's stock once the corporation was formed was a preincorporation subscription agreement, and pursuant to G.S. 55-43(b), the agreement was not enforceable because it was not in writing. G.S. 55-46(a)(2), G.S. 55-43(h) and G.S. 55-56(a).

2. Corporations § 4.1— preincorporation agreement as agreement to incorporate—necessity of a writing

An oral agreement prior to incorporation of a business which attempted to settle each party's percentage of stock in the corporation could have been considered a shareholders' agreement pursuant to G.S. 55-73(b); however, the agreement was unenforceable since G.S. 55-73(b) requires the agreement to be in writing.

3. Contracts § 4.2— oral agreement unenforceable—not based on valuable consideration

An oral preincorporation agreement between plaintiff and defendant which indicated plaintiff would be entitled to 48% of the corporation's stock once the corporation was formed was not enforceable because the agreement was not based on valuable consideration. The evidence indicated that plaintiff-husband began working more hours at defendant-wife's Kentucky Fried Chicken business once defendant-wife became ill with cancer; that plaintiff-husband agreed to work full time after an initial period only after the defendant-wife begged and cried at great length; there was no bargained-for exchange that plaintiff would receive an interest in defendant's business in consideration of his leaving his own business; that plaintiffs never discussed the ownership of the Kentucky Fried Chicken business; and that plaintiff testified that "[w]hen we separated she wanted me out of the business, and I tried three or four reasonable ways to get out of the business and to get into something else that I could do." This testimony and the circumstances of his wife's cancer under which he entered the business full time demonstrated that plaintiff's interest in the business evolved from his status as husband, and not as a business partner.

4. Declaratory Judgment Act § 1— oral agreement—relief under Declaratory Judgment Act improper

Because a parties' preincorporation agreement was oral and its enforceability had not been proved, relief under the Declaratory Judgment Act was improper. G.S. 1-253, et seq.

**5. Limitation of Actions § 4.6— contract action—three-year statute of limitations**

        Plaintiff's contract action was barred by the three-year contract statute of limitations imposed by G.S. 1-52(1) where the complaint was filed 11 August 1981, which ordinarily would be the date to which to look for the running of the statute of limitations, the parties, by stipulation, established 27 March 1981 as the cutoff date, and plaintiff's cause of action accrued on 5 January 1978.

        Judge BECTON dissenting.

APPEAL by defendants from *Friday, Judge.* Judgment entered 2 July 1982 in Superior Court, BUNCOMBE County. Heard in the Court of Appeals 30 September 1983.

    *Barnes, Wadford, Carter & Kropelnicki by Steven Kropelnicki, Jr., for plaintiff appellee.*

    *Elmore & Powell by Bruce A. Elmore, Jr., for defendant appellants.*

BRASWELL, Judge.

The present case in a nutshell concerns the struggle between a now divorced couple over the ownership of a Kentucky Fried Chicken business in Hendersonville. The plaintiff-husband claims he is entitled to 48% of the business which has now been incorporated. He has sued his wife and the corporation in which he allegedly has an interest. At trial the jury, responding to the only issue placed before them, found that the plaintiff was indeed entitled to ownership of 48% of the stock of the business. The defendant-wife based on twenty-six assignments of error appeals from the judgment entered against her. Finding error, we reverse.

In 1949, the plaintiff and the defendant-wife were married. The plaintiff opened up a tire business with his brother in Weaverville, North Carolina, in 1965. The defendant-wife, also in 1965, obtained a Kentucky Fried Chicken franchise in Hendersonville, North Carolina, from Colonel Sanders himself whom she knew personally. Originally, the defendant-wife's sister-in-law, Emily Roberts, was a partner in the business, but because of certain disputes over money in 1967, she left the business.

During this time in 1967, the defendant-wife developed cancer and with her sister-in-law's absence needed help in the

business. The defendant-wife asked the plaintiff who was her husband at the time if he would help her, and after much convincing, he agreed. The plaintiff did not initially close his tire business, but as he began to work longer hours in Hendersonville gave his interest in the tire business to his brother.

At the time the plaintiff came to help his wife in the chicken business, he testified that they had no discussion about the ownership of the business, but that she promised that if he helped her they would save all the money they could. As husband and wife, they had always used and enjoyed the other's property no matter who was legal owner. When the plaintiff agreed to help the defendant-wife in her business, she indicated that they would continue to share everything including "the money, the profits and the business, anything they did."

The plaintiff stated on direct examination that he handled the social security, the unemployment, and the time records while the defendant-wife managed the money, the taxes, the banking, and the bills. He revealed that "I gave her the money, and she would give me what I had to have. And she would get the rest."

Both parties agreed that no partnership tax returns were ever filed, and that social security and unemployment were taken out on the plaintiff. Also, the information furnished by the plaintiff on the 1976 tax return filed on the business indicated that the plaintiff earned a salary of $10,400 as an employee and that the defendant-wife as the owner showed a profit of $65,000.

Prior to 1977, the defendant-wife decided that for tax purposes she wanted to incorporate the business. The plaintiff was opposed to this idea initially, but later agreed once he was assured by the defendant-wife that she would split the ownership of the corporation's shares equally. This arrangement changed when the defendant-wife decided to give their son a few shares. According to the plaintiff, "We were talking in terms of fifty shares and—which would've been twenty-four for her, twenty-four for me, and two for her son." Yet when they actually talked to an attorney, he advised that the share division should be 48-48-4.

The defendant-wife acknowledged in her testimony that she did agree to the 48-48-4 split, but only because he was her husband, and not because he was a business partner. She explained:

He was a cook and an employee over there.

. . . I would more or less include him in a discussion, but, you know, as far as him owning the franchise, he didn't own it. He knew he didn't own it, and it never was his. But being married to somebody, you more or less take him as a partner. I didn't take him as a partner in 1968 when he went to work over there; we were partners in marriage.

. . . .

. . . He went to work there without any discussion of what was to be done in the future. I didn't think it had to be discussed. When you are married to someone, why would you say, this is mine, this is yours, and you take this. This is not the way it works.

Although the facts of this case are relatively clear, the theory or theories upon which the plaintiff may obtain relief are not. The dispute revolves around the oral agreement reached sometime near 28 April 1977 in which the defendant-wife orally agreed that the plaintiff would get 48% of the shares of stock to be issued once the business was incorporated. The defendants' assignments of error question the denial of their motions, the admissibility of much of the evidence, and the correctness of the trial judge's charge to the jury.

Yet, the ultimate question to be determined in this case is whether or nor the oral agreement between this husband and wife is enforceable by the husband on any theory. The defendants' Assignment of Error No. 10 states that the trial court erred by failing to dismiss the plaintiff's case at the appropriate times "on the grounds that the Plaintiff's evidence and all of the evidence failed to prove and support any legal basis which would support any of the relief sought by the Plaintiff."

The pleading and the transcript reveals that many theories of relief and defenses to that relief were bantered about on the trial level and now have been tossed to this Court on appeal. The complaint originally prayed for, among other things, a "judgment declaring plaintiff to be the owner of 48 percent of the shares of stock in Hamburg Valley, Inc." At trial, the plaintiff sought relief on the basis of (1) the fiduciary relationship between directors of

a corporation, (2) the fiduciary duty between a husband and wife, and (3) the presence of an enforceable oral agreement. Before the plaintiff rested his case, he asked that the pleadings be amended to conform to the evidence. The defendants, on the other hand, argued that the agreement was (1) an unenforceable stock subscription, (2) a revocable gift, and (3) barred by the statute of limitations.

Despite all these possible theories the parties stipulated that only one issue would be submitted to the jury. This issue asked: "Is the Plaintiff entitled to ownership of 48% of the stock of Hamburg Valley, Inc.?" The trial court instructed the jury on the law of contracts, charging that the issue would be decided according to whether they found an agreement between the parties.

Having considered the issue submitted, the legal premise of the jury instructions and the alternative theories for relief presented, it appears to this Court that no relief can be granted unless the plaintiff has proved a valid enforceable contract with either of the defendants. Because the plaintiff has failed to prove an enforceable agreement, we hold that the judgment below must be reversed.

I.

The major contentions that must be dealt with are: (1) was this agreement a shareholders' agreement or a preincorporation stock subscription which must be in writing to be enforceable; (2) was this oral contract based on valid consideration; (3) was a declaratory judgment an appropriate method to resolve the present dispute; and (4) was the plaintiff's claim barred by the three-year contract statute of limitations?

[1] As the facts have already indicated, the defendant-wife orally agreed prior to the filing of the Articles of Incorporation that the plaintiff would be entitled to 48% of the corporation's stock once the corporation was formed. This oral express contract was a type of preincorporation agreement and was between the plaintiff and the defendant-wife alone since the corporation had not yet come into existence.

The plaintiff vigorously contends that this agreement is not a stock subscription. According to G.S. 55-43(a), "[a] preincorporation subscription is a promise or contract to take shares in a cor-

poration to be organized and to pay the agreed price thereof to the corporation or to others for its benefit." The plaintiff's claim to any rights in this business rests on his years of service prior to incorporation and subsequent service after the incorporation of the business. G.S. 55-46(a)(2), entitled "Consideration for Shares," allows shares to be issued for "[l]abor or services actually rendered to the corporation." The word "rendered" indicates that the services must be performed prior to the issuance of the shares, so the requirement that the shares be taken for an "agreed price" has been satisfied by his previous years of work in the business.

The plaintiff contends that this agreement is not for the purchase of shares, but merely an agreement entitling him to a percentage of the business. On direct examination the plaintiff reveals otherwise:

> We talked about it before we went to the attorney's office, and she wanted to give her son a few *shares*, and I told her it didn't make any difference to me.
>
> . . . .
>
> She wanted it — we were talking in terms of *fifty shares* and — *which would've been twenty-four for her, twenty-four for me, and two for her son.*
>
> . . . .
>
> When we got to the attorney's office, I don't remember, but evidently he changed it to 48-48-4.
>
> . . . .
>
> [W]hen we were talking about *shares*, we didn't know whether it would come in ten *shares*, twenty-five, fifty or a hundred, so we was talking about fifty, which would have been a hundred percent. [B]ut when we got to the attorney's office . . . he advised us that it would be 48-48-4. (Emphasis added.)

By his own testimony the plaintiff explains what their agreement entailed. Their discussion and later agreement was that he was to receive 48 of 100 shares once the corporation was formed. Their agreement by definition was a preincorporation subscription. G.S.

55-43(b) states that "[n]o preincorporation . . . subscription is valid unless in writing, signed and delivered by the subscriber." Therefore, this agreement is not enforceable because it runs amiss of G.S. 55-43(b), one of Chapter 55's Statute of Frauds provisions. The plaintiff claimed in oral argument that this section requiring a writing is for the benefit of the corporation to prevent potential stock purchasers from failing to follow through with their agreements to purchase shares and not as an excuse by the corporation to refuse to issue the shares. Although this rationale may be correct, G.S. 55-43(h) gives either party to the subscription the right to enforce "payment of the subscription price or delivery of the share certificate, as the case may be." Nevertheless, the purpose of any statute of frauds type of provision is to prevent fraud by requiring certain important transactions to be evidenced by a writing. 37 C.J.S. *Frauds, Statute of* § 1 (1943). Further evidence is found in the Articles of Incorporation that the oral agreement concerned actual shares to be issued immediately rather than a percentage of the entire business. The Articles of Incorporation for Hamburg Valley, Inc., give the corporation the authority to issue 1000 shares and specifically deny the shareholders' preemptive rights to acquire additional or treasury shares of the corporation. G.S. 55-56 gives shareholders a preemptive right to purchase in proportion to their percentage of ownership additional shares which the corporation wishes to offer for cash. The statute also allows for this right to be limited or denied in the corporation's charter. G.S. 55-56(a). Basically, a shareholder can use his preemptive right to maintain the same percentage of control over the corporation even though the corporation issues more shares. Since their oral agreement discussed only the issuance of 100 shares, 900 shares remain which when issued may effectively undermine the plaintiff's alleged 48% of the corporation. Therefore, the Articles of Incorporation do not reflect his interpretation of their oral agreement, but indicate more strongly that their agreement was a stock subscription. We hold that because this subscription agreement with the defendant-wife was not in writing, signed by the party to be charged, and delivered by the subscriber as required by G.S. 55-43(b), it is unenforceable and the judgment below is reversed.

[2]  A preincorporation agreement may also be used in a closely-held corporation simply as an agreement to incorporate, but

which also serves as a shareholders' agreement once the corporation's organization has been completed. In a closely-held corporation often the promoters will be the sole shareholders of the corporation. In *Wilson v. McClenny*, 262 N.C. 121, 136 S.E. 2d 569 (1964), the promoters of the corporation entered into a preincorporation agreement intending that the contract would be a shareholders' agreement after incorporation. This agreement insured that each of the shareholder-promoters would vote their stock to elect each a director to the corporation and to elect the promoters as president and vice-president.

In the present case, the plaintiff contends that by the 1977 agreement he had already acquired a partnership interest in the business. He argues that he had attained the status of potential shareholder and promoter of the corporation similar to his wife. Therefore, according to the plaintiff, their agreement prior to incorporation was an attempt only to settle each party's percentage in the corporation so as to insure his receipt of at least 48% of the corporation's stock. In essence, their agreement was a shareholders' agreement which established the control of the corporation, similar to the agreement in *Wilson v. McClenny, supra*. Because the present corporation is so closely held and the Articles of Incorporation named each party as well as their son as a director, a more detailed agreement indicating how a shareholder was to vote his stock as found in *Wilson v. McClenny* was unnecessary.

G.S. 55-73(b) enables the shareholders in a closely-held corporation through such an agreement to operate the corporation like a partnership. Basically, this statute allows the formation of an incorporated partnership. *Blount v. Taft*, 29 N.C. App. 626, 225 S.E. 2d 583 (1976), *aff'd*, 295 N.C. 472, 246 S.E. 2d 763 (1978). Yet, G.S. 55-73(b) requires that there must be an agreement in writing of all the shareholders. Although this "writing may consist of a written provision in the charter or by-laws," *id.* at 631, 225 S.E. 2d at 586, a review of the present charter reveals no embodiment of such an agreement establishing each party's percentage share of the corporation. Thus, because their agreement was oral, it is an unenforceable shareholders' agreement. Therefore, the plaintiff would have to prove the percentage of the business he claims he had previously acquired and would not be able to rely on the 48% agreed upon in the unenforceable shareholders' agreement. As

the record clearly shows, the plaintiff has offered no evidence as to what percentage of the business he allegedly acquired between 1967 and 1977.

## II.

[3] The above discussion attacks the oral nature of the agreement through the statutes of the Business Corporation Act. The following treatment looks to whether the agreement is enforceable on the basis of regular contract law. The plaintiff stated openly to the trial court that "Your Honor, our entire theory is that there was an agreement which this court can enforce." To be enforceable, this agreement, like other contracts, must be based on valuable consideration.

The plaintiff contends that in 1967 he received a part of her business in consideration of his leaving his tire business to come and work for her. The plaintiff's testimony at trial does not support that contention. He stated that from the first day that the Kentucky Fried Chicken business opened he had helped his wife by working there. When the defendant-wife became ill, he began working more hours but initially he was only going to work for awhile. Later, only after the defendant-wife had begged and cried at great lengths did he agree to work there longer. When asked what the defendant-wife thought or what he told her would happen to his business once he came to work for her, he replied that even he did not know what would happen to his business, implying that there was no bargained-for exchange that he would receive an interest in her business in consideration of his leaving his own business.

The plaintiff also stated that they never discussed the ownership of the Kentucky Fried Chicken business. He indicated that the only promise she made with respect to his change in jobs was that "we'd save all that we could if I went." The fact that she stated that they would share everything is not tantamount to saying that she was giving him a legal interest in the business.

Finally, the plaintiff related that "[w]hen we separated she wanted me out of the business, and I tried three or four reasonable ways to get out of the business and to get into something else that I could do." This testimony and the circumstances of his wife's cancer under which he entered the business full time

demonstrated that his interest in the business evolved from his status as a husband, and not as a business partner.

In *Leatherman v. Leatherman*, 297 N.C. 618, 256 S.E. 2d 793 (1979), the plaintiff-wife had worked in the family business, up to forty hours a week for twenty-three years. The business was later incorporated and all 930 shares of stock were issued to her husband. He explained that this arrangement was necessary for tax purposes and that she would get the business eventually anyway. On the basis of resulting trust and constructive trust, the Supreme Court denied that the wife was entitled to any of the shares in the corporation.

The first premise of the Supreme Court's analysis in *Leatherman* stated that the plaintiff-wife had not overcome "the presumption that services rendered by a wife in her husband's business are gratuitously performed absent a special agreement to the contrary." *Id.* at 622, 256 S.E. 2d at 796. This presumption utilized in *Leatherman* refers only to a wife and her services in the husband's business. This presumption should equally apply to a husband's services in the wife's business. In *Guano Co. v. Colwell*, 177 N.C. 218, 98 S.E. 535 (1919), the Court stated that absent a contract between the husband and wife the husband was entitled to no share in the crops or profits from his wife's farm, the presumption being that he was working gratuitously to contribute to the support of the family. In the present case, the plaintiff offered no evidence that the defendant-wife agreed to give him a specific interest in her business when he began work for her in 1967. The only agreement established was reached in 1977 after his services had been rendered. Therefore, he has shown no special agreement that his services were not originally and continually gratuitously performed, even though, like the wife in *Leatherman* he was paid a salary. Also, in light of the fact that his wife was in very poor health, that she was suffering from cancer, and that he only came to her rescue after much emotional pleading from her, indicates that he entered the business because he was her husband, and not because of any special contractual agreement between them.

The plaintiff does not attempt to establish that at any other time did he and the defendant-wife enter into an agreement about his interest in the business. The filing of partnership tax returns

is significant evidence of the existence of a partnership. *Davis v. Davis*, 58 N.C. App. 25, 31, 293 S.E. 2d 268, 272, *disc. rev. denied*, 307 N.C. 127, 297 S.E. 2d 399 (1982). No such returns were filed, and in 1976 the tax return for which the plaintiff supplied the information designated the plaintiff as an employee, indicating that no agreement making him a partner was reached prior to this time. The importance of the fact that no express agreement between 1967 and 1979 was pled or proved establishes that the oral agreement in 1977 concerning his percentage in the corporation was not supported by valid consideration. A reading of the record as a whole reveals that the oral agreement of 1977 was simply a statement by the wife of her intention to formally share through a gift a part of her business with her husband and her son who had also worked for her. Since the stock has never been issued, this gift by the defendant-wife has never been delivered, delivery being a necessary element before a gift can be validated. *See Fesmire v. Bank*, 267 N.C. 589, 148 S.E. 2d 589 (1966). Also, since his labor and services in the corporation had already been performed, they cannot serve as the consideration in exchange for his wife's future performance of relinquishing to him part of her business so as to render this contract enforceable. 17 C.J.S. *Contracts* § 116 (1963). Although the plaintiff worked after the 1977 agreement, he offered no evidence and did not attempt to prove that his 48% was in consideration for those future services. We hold that the preincorporation agreement is not binding or enforceable because it was not based on valuable consideration necessary for a valid contract.

### III.

[4] In the alternative, we have elected to discuss the claim for declaratory relief expressed in paragraph twenty-eight of the complaint. The parties stipulated that only the following issue would be submitted to the jury: "Is the Plaintiff entitled to ownership of 48% of the stock of Hamburg Valley, Inc.?" The jury answered, "Yes." The judgment as signed by the trial judge based on the jury's response to this issue does declare that the plaintiff is entitled to ownership of 48% of the corporation's stock [which would mean 480 shares]. We hold that on the record before us that a declaratory judgment is inapplicable for two reasons.

In the first place, "[t]he Declaratory Judgment Act, G.S. 1-253, *et seq.*, affords an appropriate procedure for alleviating

uncertainty in the interpretation of *written* instruments and for clarifying litigation." (Emphasis added.) *Bellefonte Underwriters Insur. Co. v. Alfa Aviation*, 61 N.C. App. 544, 547, 300 S.E. 2d 877, 879 (1983). Therefore, a declaratory judgment action is designed to provide an expeditious method of procuring a judicial interpretation of *written* instruments, such as wills, contracts, statutes, and insurance policies. *See Bennett v. Attorney General*, 245 N.C. 312, 96 S.E. 2d 46 (1957). In the present case, there is no written instrument for the trial judge to interpret or from which he can declare rights. The plaintiff in order to obtain a declaratory judgment must have offered an enforceable written agreement so the trial judge as a matter of law could resolve the issue of whether the plaintiff was entitled to 48% of the corporation's stock. The existence of some agreement is not in dispute, but because it is an oral agreement and its enforceability has not been proved, relief under the Declaratory Judgment Act is improper.

Secondly, the remedy of a declaratory judgment is not available for the determination of issues of fact alone. Although it may be necessary in order to resolve the legal questions that certain questions of fact be decided, the primary purpose of the Declaratory Judgment Act is for the determination of questions of law. *Insurance Co. v. Unemployment Compensation Com.*, 217 N.C. 495, 8 S.E. 2d 619 (1940). The parties by their stipulation as to the issue allowed the case to be determined on the basis of a question of fact before the jury. Once the jury had decided this fact, the trial judge had no questions of law to resolve. The final judgment merely orders and declares the jury's answer to the issue submitted, demonstrating that a declaratory judgment was unnecessary and inappropriate in this case.

## IV.

[5]   Again, in the alternative and aside from the above reasons, the judgment must be reversed outright, and not merely remanded for a new trial, because the action was barred by the statute of limitations. The defendants effectively raised this defense on 9 November 1981 in their answer to the complaint. Although in form the complaint asked for relief through a declaratory judgment, in substance, as represented by the evidence produced and the issue submitted to the jury, the action is based on contract.

Penley v. Penley

Therefore, G.S. 1-52(1), the three-year contract statute of limitations, is the appropriate statute to apply.

Although the complaint was filed 11 August 1981 and ordinarily would be the date to which to look for the running of a statute of limitations, the parties have by stipulation established 27 March 1981 as the cutoff date. This date of 27 March 1981, according to the stipulation, is bottomed upon prior dealings in certain specific domestic relations cases between the parties. We adopt their stipulation.

The cause of action to enforce the oral agreement entitling plaintiff to 48% of the stock accrued as soon as the corporation was formed. The formation of the corporation occurred through the filing of the Articles of Incorporation on 28 December 1977. See G.S. 55-8. The Articles list the plaintiff as one of the three-member board of directors and as vice president, a corporate officer. Machinery exists for an organizational meeting of the board of directors named in the Articles of Incorporation upon giving three days' notice as provided by G.S. 55-11. Anytime after such three days' notice and meeting the stock could have been issued. New Year's Day in 1978 fell on a Sunday. The following day was a legal holiday. If for instance the three days' notice of organizational meeting had been given on 30 December 1977, the earliest official day for the meeting would have been 5 January 1978. As a matter of arithmetic more than three years elapsed between 5 January 1978 and 27 March 1981. We hold the statute of limitations had run and this present action is barred.

We recognize that the plaintiff, through paragraphs 19 and 22 of the complaint, seeks to assert the date of 31 December 1979 as the date the individual defendant denied him his property rights. The complaint alleges that 31 December 1979 is when the defendant-wife abandoned the plaintiff and left the marital home. While this date may be important for domestic relation litigation, it is irrelevant to the enforcement of an oral contract made in 1977 for corporate stock. As was said in Lewis v. Shaver, 236 N.C. 510, 513, 73 S.E. 2d 320, 322 (1952), "the mere lack of knowledge of the facts constituting a cause of action does not postpone the running of the statute." See also Gordon v. Fredle, 206 N.C. 734, 175 S.E. 126 (1934).

## V.

The remaining assignments of error from the defendants' list of twenty-six deal almost exclusively with the admission of evidence and jury instructions. Since the plaintiff is not entitled to any judgment in his favor and since no new trial has been ordered, we decline to discuss them.

We reverse the judgment of the trial court entered in favor of the plaintiff.

Reversed.

Judge JOHNSON concurs.

Judge BECTON dissents.

Judge BECTON dissenting.

The provisions of the Business Corporation Act, codified at N.C. Gen. Stat. §§ 55-1 *et seq.* (1982), do not, in my view, defeat Mr. Penley's claim. Mrs. Penley's agreement with Mr. Penley that he was to receive stock when the Kentucky Fried Chicken business was incorporated was neither a pre-incorporation agreement nor a shareholders' agreement. Further, I am not convinced that the statute of limitations is a bar to Mr. Penley's claim. No stock in the corporation has ever been issued. I believe the statute of limitations runs from the time Mr. Penley made a demand for the stock promised—the breach of the contract. Mr. Penley filed his action within three years of his demand.

In my view, this case turns on an analysis of simple contract law. The majority has decided that the agreement to split the stock lacks valuable consideration. I disagree. From the outset, Mr. Penley has proceeded on the theory, as revealed by his complaint and his evidence at trial, that the parties entered into a partnership agreement prior to the proposed incorporation. The partnership agreement constitutes the "special agreement" absent in *Leatherman.* Consequently, Mr. Penley's surrender of his partnership interest was the valuable consideration for the agreement to split the stock.

Mrs. Penley's attorney stipulated that the following issue would be submitted to the jury: "Is the Plaintiff entitled to

ownership of 48% of the stock in Hamburg Valley, Inc.?" Sub-
sumed within the jury's finding that Mr. Penley was entitled to
48% of the stock is the jury's determination that there was
"valuable consideration." Although Mrs. Penley's attorney ob-
jected to the court's instruction on consideration, he based his ob-
jection on narrow grounds. His assignment of error deals only
with the court's failure to limit its instruction on consideration to
an oral trust theory. Since Mrs. Penley failed to assign error to
the sufficiency of the instruction on consideration on a partner-
ship theory, and since she stipulated to the issue submitted to the
jury, I believe the jury's verdict should stand. In my view, the
trial court's judgment should be affirmed.